## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TREVOR WILKS, | : |
| | : |
|     Plaintiff, | : |
| | : |
| v. | :    No. 3:04CV01655(DJS) |
| | : |
| ELIZABETH ARDEN, INC., | : |
| | : |
|     Defendant. | : |

## <u>MEMORANDUM OF DECISION AND ORDER</u>

The Plaintiff, Trevor Wilks ("the Plaintiff"), proceeding <u>pro se</u>, brings this action against the Defendant, Elizabeth Arden, Inc. ("the Defendant") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e <u>et. seq.</u> ("Title VII"). Specifically, the Plaintiff alleges that the Defendant violated Title VII by subjecting him to a hostile work environment and terminating him based on his national origin. The Plaintiff also alleges that the Defendant violated Title VII by retaliating against him because he opposed discriminatory treatment. In addition, the Plaintiff alleges that the Defendant failed to pay him for vacation pay owed to him. Now pending is the Defendant's motion for summary judgment **(dkt. # 36)** pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated herein, the Defendant's motion for summary judgment **(dkt. # 36)** is **GRANTED** with respect to the Plaintiff's

federal claims.  Additionally, the Plaintiff's vacation pay claim is **DISMISSED without prejudice to the Plaintiff bringing that claim in state court.**

## I. THE PLAINTIFF'S SUBMISSIONS

Before setting forth the background facts of this case, the court notes that the Defendant, in its Reply Memorandum, asks the court to grant the summary judgment motion without reaching the merits of the Plaintiff's claims because the Plaintiff has failed to comply with Rule 56 of the Local Rules of Civil Procedure for the District of Connecticut ("D. Conn. L. Civ. R."). Specifically, the Plaintiff did not file a "Local Rule 56(a)(2) Statement" with his opposition memorandum.[1]  (See dkt. # 39.) Under Local Rule 56(a)(2), "[t]he papers opposing a motion for summary judgment shall include a document entitled 'Local Rule 56(a)2 Statement,' which states in separately numbered paragraphs . . . corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied."  D. Conn. L. Civ. R. 56(a)(2).  "All material facts set forth in [the moving party's Local Rule 56(a)1] [S]tatement and supported by the

---

[1]The court points out that, pursuant to Local Rule 56(b), the Defendant sent to the Plaintiff a Notice to Pro Se Litigant Opposing Motion for Summary Judgment (see dkt. # 36-4), which set forth the Plaintiff's obligations in opposing summary judgment.

evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)2." D. Conn. L. Civ. R. 56(a)(1). Although the Plaintiff has filed an opposition memorandum, he has not filed a Local Rule 56(a)(2) Statement in response to the Defendants' Local Rule 56(a)(1) Statement.

Rule 56 of the Federal Rules of Civil Procedure "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002). The District of Connecticut has set forth rules that are meant to assist the court when reviewing summary judgment motions. "The purpose of [Local] Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed." Coger v. Connecticut, 309 F. Supp. 2d 274, 277 (D. Conn. 2004). "Absent such a rule, 'the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties.'" S.E.C. v. Global Telecom Servs., L.L.C., 325 F. Supp. 2d 94, 108 (D. Conn. 2004) (quoting N.S. v. Stratford Bd. of Educ., 97 F. Supp. 2d 224, 227 (D. Conn. 2000)). "The Local Rules provide clear notice that 'failure to provide specific citations to evidence in the record as required

-3-

by this Local Rule may result in sanctions, including . . . when the opponent fails to comply, an order granting the motion.'" <u>Id.</u> at 108-09 (quoting D. Conn. L. Civ. R. 56(a)(3)).

The court is well aware, however, that "the submissions of a <u>pro</u> <u>se</u> litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest*." <u>Triestman v. Federal Bureau of Prisons</u>, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis in original) (internal quotation marks omitted). "This policy of liberally construing <u>pro</u> <u>se</u> submissions is driven by the understanding that [i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect <u>pro</u> <u>se</u> litigants from inadvertent forfeiture of important rights because of their lack of legal training." <u>Id.</u> at 475 (internal quotation marks omitted). On the other hand, "<u>pro</u> <u>se</u> parties are not excused from abiding by the Federal Rules of Civil Procedure." <u>Collins v. Experian Credit Reporting Service</u>, No. 3:04CV1905(MRK), 2006 WL 2850411, at *1 (D. Conn. Oct. 3, 2006); <u>see</u> <u>McNeil v. United States</u>, 508 U.S. 106, 113 (1993); <u>LoSacco v. City of Middletown</u>, 71 F.3d 88, 92 (2d Cir. 1995) (holding that pro se litigants "generally are required to inform themselves regarding procedural rules and to comply with them . . . . This is especially true in

civil litigation.") (internal citations and quotation marks omitted).

Although the Plaintiff's failure to comply with the Local Rules could, by itself, result in the court granting summary judgment in favor of the Defendants, the court shall nevertheless consider the Plaintiff's memorandum opposing summary judgment, which does not contain any legal analyses, but rather factual assertions. The Defendant's request that the court grant summary judgment because the Plaintiff failed to file his Local Rule 56(a)(2) Statement is therefore denied. In deference to the Plaintiff's <u>pro</u> <u>se</u> status, the court, to the extent possible, will regard the Plaintiff's version of the facts contained in his opposition (excluding arguments or conclusory statements) as responsive to the Defendant's Local Rule 56(a)(1) Statement. For the purposes of this motion, however, the court shall deem admitted all facts set forth in the Defendant's compliant Local

Rule 56(a)(1) Statement that are supported by the evidence[2] and not refuted by the Plaintiff's opposition memorandum.

## II. FACTS

The Defendant is a global manufacturer and marketer of fragrances and related skin treatment and cosmetic products. In January 2001, the Defendant acquired the "Elizabeth Arden" branded fragrance, skin care, and cosmetics business from Unilever and its affiliates. The Plaintiff, whose national origin is Jamaican, began working for Unilever in 1993, approximately eight years before the acquisition.[3]

The Plaintiff states that, when he began working in 1993, his title was "Cash Applicator," which apparently was a position in the company's Accounting Department. The Plaintiff further states that he left the Accounting Department in January 1997 and was transferred to the Sales Department, with the title of "Sales

---

[2]The court is aware that "in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Local] Rule 56[] statement. It must be satisfied that the citation to evidence in the record supports the assertion." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see Giannullo v. City of New York, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (stating that, "although [Local] Rule 56[] is designed to streamline the district court's consideration of summary judgment motions," not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

[3]In his deposition testimony, the Plaintiff states that the company was owned by "Cheesebrough Ponds" when he was first hired in 1993. (See dkt. # 36-5, Ex. B, Wilks Dep. at 20:13-25.)

Analyst."  The Plaintiff alleges that in late 1999 or early 2000, his title changed to "Sales Specialist," which the Plaintiff considers to be the first of two demotions he would receive.

The Defendant asserts that, in November 2001, after the acquisition, it reorganized the Plaintiff's department and changed a number of job titles.  According to the Defendant, the titles "Sales Specialist" and "Sales Analyst" (both of which the Plaintiff had held at some point) were eliminated, and no Elizabeth Arden employee held either title after the reorganization.  After the reorganization, the Plaintiff was given the title "Sales Administration Account Coordinator" ("Account Coordinator") and was placed under the supervision of Sally Sachse ("Sachse").  As a Sales Administration Account Coordinator, the Plaintiff was responsible for retail and gross sales reporting, and system account/territory assignment and maintenance.  In addition, the Plaintiff was to work with the Information Technology group to develop effective and accurate reporting.

The Plaintiff considers this title change to be his second demotion.  According to the Plaintiff, Sachse told him that the Account Coordinator position was an entry-level position; yet, the Plaintiff maintains that his workload increased "fourfold." Still, the Plaintiff testified that he does not believe that the

responsibilities the Defendant gave him subsequent to the acquisition and reorganization were given in an effort to discriminate against him. (See dkt. # 36-5, Ex. B, Wilks Dep. at 48:16-22.) The Plaintiff complained about his increased workload to Angelo Sestito ("Sestito"), who apparently worked in the Defendant's Human Resources Department ("HR").

In March 2002, Sachse gave the Plaintiff his first performance review as an Account Coordinator. (See id., Ex. E.) From what the court can discern, the performance review was mostly positive, noting that the Plaintiff had successfully taken on many aspects of his duties. The only negative comments in the performance review were that "[a]s systems and process improve . . ., [Wilks] will need to work on improving his timeliness of reports" and "[b]ecause [Wilks] is still adapting to the reporting needs and structure within the Arden field sales, he needs to focus on the timeliness of reporting. Decisions will need to be made on how to approach the data and how to turn it around in time to meet reporting deadlines." (See id., pp. 3-4.) The Plaintiff apparently took issue with these negative comments and maintains that his reports were never late.

In April 2002, at the time of the Plaintiff's annual performance review, the Defendant gave the Plaintiff a discretionary raise. The Plaintiff's salary went from $37,800.00

to $39,200.00, an increase of approximately 3.7%. (See id., Ex. G.) According to the Performance Increase Worksheet submitted by the Defendant, the Plaintiff, out of the six employees in his department, received the third-highest raise in terms of percentage; the average raise in the Plaintiff's department was 3.53%. (See id.)

On August 30, 2002, Sachse wrote to the Plaintiff a memorandum regarding a verbal warning she had given him on August 28, 2002. (See id., Ex. H.) In the memorandum, Sachse noted that the Plaintiff had submitted a wrongly formatted, late report that contained incorrect information. (See id.) Sachse also noted that the Plaintiff had failed to notify his supervisors that he was going to be out on vacation from August 19-27, 2002. (See id.) Sasche concluded the memorandum by informing the Plaintiff that she "will continue to monitor [his] performance in the next 15 to 30 days. If significant and consistent improvement is not seen in the areas discussed then a written warning will be issued and subsequently any repeated occurrence will result in further disciplinary action." (See id.)

The Plaintiff apparently filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") on October 7, 2002, claiming that he was being discriminated against, harassed, demoted, denied raises, and given poor

evaluations and verbal warnings, because of his national origin.[4] According to the Plaintiff, he was made to feel "very uncomfortable" by the Defendant after the CHRO complaint was filed, although it is not clear to the court what exactly the Defendant did. The Plaintiff does state that he was not given a work area conducive to working efficiently (for example, there was a fax machine and paper shredder in his cubicle), that he was denied the tools for his job (for example, the denial of a request for a laptop computer), and that Sachse and Sestito would not greet him in the morning. The record is not clear as to whether these events occurred before or after the CHRO complaint was filed. The Plaintiff has also stated that he made complaints to HR, and that he was retaliated against for those complaints, but it is not clear what alleged retaliatory action was taken.

The Defendant asserts that the Plaintiff's "performance problems" continued after the above-mentioned August 28, 2002 warning. According to the Defendant, the Plaintiff submitted incorrect and late reports, failed to respond to Sachse's request for his 2002 vacation days, and was insubordinate and sarcastic to Sachse. The Defendant claims that the Plaintiff failed to complete a project that was due by the end of February 2003. As a result of the alleged failure to complete this project,

_____

[4]On April 21, 2003, the CHRO issued a "Notice of Final Agency Action," wherein it dismissed the Plaintiff's CHRO complaint.

Sachse sent to the Plaintiff a "Final Written Warning," dated
March 13, 2003, about his performance.  (See id., Ex I.)  In the
"Final Written Warning," Sachse noted the Plaintiff's apparent
failure to complete the project in question, and stated the
following:

> In order to continue your employment here, you must
> make an immediate and sustained improvement in your job
> performance and conduct.  If you do immediately address
> these issues, in approximately 30 days we will meet to
> decide whether the improvement is sufficient to justify
> your continued employment.  As always, I am available
> to assist you with any questions you have.  Trevor, we
> hope you succeed.  However, please understand that if
> any further incidents of unprofessional behavior,
> disregard for instructions or insubordination occur our
> company will undertake further disciplinary action up
> to and including termination from employment.

(Id.)

On April 2, 2003, Sachse gave the Plaintiff his annual
performance evaluation.  (See id., Ex. L.)  In that evaluation,
the Plaintiff received mostly negative reviews, scoring low in
the "Job Knowledge," "Quality of Work," "Quantity of Work,"
"Reliability," "Initiative and Creativity," "Judgement," and
"Attendance" categories.  (See id.)  Sachse's comments in the
evaluation were as follows:

> Trevor's original job description and responsibilities
> over the past year have been limited in order to remedy
> his difficulty in executing his assigned tasks in the
> new position.  Responsibilities were taken away and he
> was told this would allow him to develop and focus on
> the retail/EDI reporting for both Ardent and PIL.  At
> this time, his efforts in producing retail sales

reports have been limited and not up to department
expectations. Examples include, issues with formats,
timeliness, information structure and communication of
these reports. In addition to working with Trevor on
the quality of his output I have worked closely with IT
to develop templates and pre-designed reports that
should have resulted in an increase in Trevor's output
but regrettably did not. In addition, Trevor and I
have had numerous conversations regarding his lack of
communication with me, as his supervisor, and his
failure/refusal to follow directions. In summary,
Trevor's performance needs to improve in all areas of
his job responsibilities and his performance needs to
improve.

(Id.) On the evaluation form, the Plaintiff was given the

opportunity to provide his own comments regarding Sachse's

evaluation; the Plaintiff wrote the following comments, dated

April 8, 2003: "I do not concur with this evaluation/review and

everything written here is an attempt to un-justify my complaints

with the Connecticut Human Rights Organization which I can prove.

This is not a review, this is like a lynching. (vincit omnia

veritas)" (See id.) Despite this negative evaluation, however,

the Plaintiff received a salary increase. In a memorandum to the

Plaintiff dated April 7, 2003, the Plaintiff was informed that

his department head had recommended that the Plaintiff's annual

salary go from $39,200.00 to $40,376.00, a 3% increase. (See

id., Ex. M.)

The Plaintiff apparently spoke with Mary Beth O'Brien

("O'Brien"), the Vice President Corporate Sales Management and

Sachse's supervisor, for approximately an hour and fifteen

-12-

minutes about issues he was having at work.  O'Brien wrote a

memorandum, dated April 4, 2003, to Sestito about her

conversation with the Plaintiff.  (See id., Ex. K.)  In that

memorandum, O'Brien represented that the Plaintiff called Sestito

a liar and stated Sachse was not telling O'Brien "the whole

story."  (See id.)  The Plaintiff apparently called Sestito a

liar because the Plaintiff was told at a "harassment seminar"

that the company's computer system kept records of email usage

and could prove when emails are not related to work, whereas

Sestito had told the Plaintiff that the company did not read

employee emails.  (See id.)  The Plaintiff also seems to have

discussed his vacation time usage; he apparently asserted his

belief that he was entitled to two more days than he was given.

(See id.)  When O'Brien asked the Plaintiff to provide

documentation or some other proof about the amount of vacation

time used, the Plaintiff apparently refused.  (See id.)  In

addition, the Plaintiff allegedly accused Sachse of "changing a

column in a sales file."  (See id.)

O'Brien also mentioned the memorandum that the Plaintiff

claimed the following: a previous employee named Ximena Hurtado

("Hurtado") apparently told the Plaintiff that an employee named

Eileen Kelly ("Kelly") told Hurtado that Sachse told Kelly that

she (Sachse) would give the Plaintiff so much work, he would

become frustrated and quit.[5]  (See id.)   The Plaintiff, for his part, relates this incident in his opposition memorandum, and his description is consistent with O'Brien's.

O'Brien further represented that the Plaintiff complained about the denial of his request for a laptop computer.  (See id.)  O'Brien apparently told the Plaintiff that this was a "non-issue," that because a laptop computer is a major expense that requires approval from "Senior Management," he would not have received a laptop by simply requesting one.  (See id.)  According to O'Brien, the Plaintiff responded by accusing O'Brien of being on Sestito's and Sachse's "side."  (See id.)

O'Brien then represented that she questioned the Plaintiff about his job performance issues, which she went through with the Plaintiff.  (See id.)  The Plaintiff apparently responded, "I am an ideal employee, never had a problem before."  According to O'Brien, the Plaintiff then said that he hoped he got fired in the next two weeks, that he couldn't "take it anymore," as his health was in jeopardy and he was taking medicine.  O'Brien states that, when the meeting concluded, she told the Plaintiff that he had the opportunity to improve, and she thanked him for speaking with her.  (See id.)

---

[5] Obviously, the court highly doubts the admissibility of such a piece of evidence (i.e., a statement made by Hurtado to the Plaintiff about a statement made by Kelly to Hurtado about a statement made by Sachse to Kelly).

On April 11, 2003, Sachse reviewed, in writing, the Plaintiff's performance for the preceding 30-day period. (See id., Ex. N.) In her review, Sachse stated that the Plaintiff "continues to be insubordinate and continues to have problems in responding to my emails," and he "has still experienced difficulty publishing his standard monthly reports." (See id.) Sachse concluded the review as follows: "Regrettably, Trevor has not made any significant or sustained improvement in his job performance or conduct over the last 30 days since his written warning. As a result I recommend that Trevor Wilks be terminated from his position of Account Administration Coordinator." (Id.) The Defendant terminated the Plaintiff's employment for "unsatisfactory performance" on April 15, 2003. (See id., Ex. O)

### III. DISCUSSION

The Plaintiff alleges that the Defendant's conduct violated Title VII, and that the Defendant failed to pay him for vacation pay owed to him. The Defendant asserts that the Plaintiff's claims must fail because: (1) some of the Plaintiff's Title VII allegations are time-barred; (2) for those Title VII allegations that are not time-barred, the Plaintiff cannot support his Title VII claims; and (3) the Plaintiff cannot support his vacation pay claim. The court shall discuss the Plaintiff's claims seriatim.

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catreet, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" Am. Int'l Group v. London Am. Int'l Corp., 664 F. 2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "' if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d

Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

B. TITLE VII TIME BAR/STATUTE OF LIMITATIONS ANALYSIS

The Plaintiff alleges that he was discriminated against because of his national origin in violation of Title VII. "An individual wishing to challenge an employment practice under [Title VII] must first file a charge with the [Equal Employment Opportunity Commission]." Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S. Ct. 2162, 2166 (2007). "Such a charge must be filed within a specified period . . . ." Id. Therefore, before addressing the merits of the Plaintiff's substantive Title VII claims, the court must first determine whether the allegedly discriminatory acts are properly before the court.

In general, Title VII discrimination claims must be filed with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the date on which the "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). If, however, a claimant has filed a charge of discrimination in a state or locality that has its own anti-discrimination laws and enforcement agency, the time period for filing claims with the EEOC is extended to 300 days from the date of the unlawful practice. Id.; see Edelman v. Lynchburg Coll., 535 U.S. 106, 109 n.1 (2002); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765

(2d Cir. 1998). Connecticut has its own anti-discrimination agency, the CHRO. Thus, the 300-day limitation applies to the Plaintiff's claims here. "This requirement functions as a statute of limitations, . . . in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court . . . ." Quinn, 159 F.3d at 765 (internal citations omitted); see Ledbetter, 127 S. Ct. at 2166-67 ("[I]f the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court . . . .")

Nevertheless, "[d]iscriminatory acts occurring before the 300-day charging period may be saved from time bar by the 'continuing violation' doctrine, which offers one means by which plaintiffs can assert otherwise time-barred acts, as 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" Pearson v. Bd of Educ., --- F. Supp. 2d ----, 2007 WL 2296453, at *13 (S.D.N.Y. 2007) (quoting Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 25 (2d Cir. 1985)). "If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation marks omitted).

"[T]he continuing violation exception is usually associated with a discriminatory policy, rather than with individual instances of discrimination . . . ." Id. "[A] continuing violation may be found where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." Id. (internal quotation marks omitted). Still, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993).

As for a hostile work environment claim, which is a type of "continuing violation" claim, "[g]iven . . . that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002) "In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." Id. Nevertheless, the Supreme Court, in distinguishing "discreet acts" from "ongoing violations" (such as a hostile work environment), noted that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts

alleged in timely filed charges." Id. at 113. "Discrete acts

such as termination, failure to promote, denial of transfer, or

refusal to hire are easy to identify." Id. at 114.

From what the court can discern from the parties'

submissions, the following occurred at the administrative level:

(1) on October 7, 2002, the Plaintiff filed a CHRO complaint (No.

0320133), alleging ancestry and national origin discrimination;

(2) on December 20, 2002, the Plaintiff amended his CHRO

complaint to correct the spelling of his name; (3) on April 21,

2003, the CHRO issued a "Notice of Final Agency Action," wherein

it dismissed the Plaintiff's CHRO complaint; (4) on February 2,

2004, after his April 15, 2003 termination, the Plaintiff filed

an EEOC complaint (No. 161-2004-00172), alleging that he was

terminated from his position because of his ancestry and national

origin and in retaliation for his earlier complaint with the

CHRO[6]; and (5) On July 7, 2004, the EEOC dismissed the

_____

[6]In fact, in the February 2, 2004 EEOC complaint, the Plaintiff alleges
that the Defendant's retaliatory conduct resulted from his "complaint of
discrimination with the CHRO and the EEOC," which the Plaintiff alleges
he filed on October 7, 2002. (Dkt. # 36, Brady Aff., Ex. R.)  Although
the parties have submitted a copy of the October 7, 2002 CHRO complaint,
they have not submitted a copy of this alleged EEOC complaint.  In the
April 21, 2003 "Notice of Final Action," the CHRO does reference an EEOC
action (No. 16AA30091) filed by the Plaintiff.  Nevertheless, although
the Plaintiff may have filed an EEOC complaint on October 7, 2002, the
court does not know the EEOC's decision in that matter, nor does the
court know whether the Plaintiff received a release from the EEOC.
Therefore, for the purposes of this motion, the court cannot include the
alleged October 7, 2002 EEOC complaint in its analysis.

Plaintiff's EEOC complaint and issued a "Right to Sue" letter.[7]

The Plaintiff subsequently filed the instant action on October 1, 2004. Under Connecticut law, "[a]ny person who has timely filed a complaint with the [CHRO] . . . and who has obtained a release from the commission . . . , may also bring an action in the superior court for the judicial district in which the discriminatory practice is alleged to have occurred or in which the respondent transacts business . . . ." Conn. Gen. Stat. § 46a-100. Connecticut law also states, however, that "[a]ny action brought by the complainant in accordance with section 46a-100 shall be brought within ninety days of the receipt of the release from the commission." Id. § 46a-101(e). Thus, this case cannot proceed from the Plaintiff's October 7, 2002 CHRO complaint, as the CHRO granted the release of that complaint on April 21, 2003, and the Plaintiff filed this action well beyond the ninety days mandated by statute.[8]

The Plaintiff's case must flow from the February 2, 2004 EEOC complaint and the EEOC's subsequent release on July 7, 2004. Following the July 7, 2004 release from the EEOC, the Plaintiff

---

[8]The court points this out because the Defendant, in its opposition memorandum, argues that some of the Plaintiff's claims are time-barred due to the fact that they occurred more than 300 days before the Plaintiff filed his October 7, 2002 CHRO complaint. The October 7, 2002 CHRO complaint is not, however, the proper benchmark from which to measure the 300-day limitation period.

had ninety days to file a lawsuit.  See 42 U.S.C.

§ 2000e-5(f)(1).  This action, filed on October 1, 2004, was

brought within ninety days of the EEOC's release.  Therefore,

when determining what actions are properly before the court, the

court must use the February 2, 2004 EEOC complaint, not the

October 7, 2002 CHRO complaint, when discussing the 300-day

limitation described above.  Consequently, the earliest "discreet

act" of discrimination the court can consider must have occurred

on April 8, 2003, which is 300 days before the Plaintiff filed

his February 2, 2004 EEOC complaint.

Here, a liberal reading of the Plaintiff's complaint finds

that the Plaintiff has asserted discrimination, retaliation, and

hostile work environment claims pursuant to Title VII.  For the

purposes of the Plaintiff's Title VII hostile work environment

claim, the court shall consider conduct that occurred before

April 8, 2003 because the last discriminatory act alleged took

place within the 300-day limitation period; however, for the

purposes of the Plaintiff's Title VII discrimination and

retaliation claims, however, only the acts that fall within the

300-day limitation period (here, the April 11, 2003 performance

review and the April 15, 2003 termination) shall be considered.

See Richards v. City of New York, No. 05 CV 1163(SLT)(MDG), 2007

WL 1030294, at *8 (E.D.N.Y. Mar. 30, 2007).  That is, the

Plaintiff is precluded from asserting in this action any pre-April 8, 2003 conduct by the Defendant as specific, compensable acts of discrimination or retaliation under Title VII.  But, "time-barred conduct may still be offered as evidence of discriminatory intent to support timely claims." Nakis v. Potter, 422 F. Supp. 2d 398, 410 (S.D.N.Y. 2006); see Morgan, 536 U.S. at 113 ("Nor does the statute bar an employee from using prior acts as background evidence to support a timely claim.").

C. TITLE VII NATIONAL ORIGIN DISCRIMINATION CLAIM

Title VII of the Civil Rights Act of 1964 directs that it is "unlawful for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  The Plaintiff alleges that he was discriminated against because of his national origin, which is Jamaican.  As discussed above, the only acts the court may consider as specific, compensable acts of discrimination are the Plaintiff's April 11, 2003 performance review and the Plaintiff's April 15, 2003 termination.

Title VII discrimination claims are analyzed using the familiar burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The

Second Circuit has described the applicable legal standard for

the evaluation of Title VII claims as follows:

> At the outset, a plaintiff can avoid dismissal by
> presenting the "minimal" prima facie case defined by
> the Supreme Court in McDonnell Douglas. This requires
> no evidence of discrimination.  It is satisfied by a
> showing of membership in a protected class,
> qualification for the position, an adverse employment
> action, and preference for a person not of the
> protected class. . . .  By making out this "minimal"
> prima facie case, even without evidence of
> discrimination, the plaintiff creates a presumption
> that the employer unlawfully discriminated, . . . and
> thus places the burden of production on the employer to
> proffer a nondiscriminatory reason for its action.
> . . .
>      On the other hand, once the employer articulates a
> non-discriminatory reason for its actions, . . . the
> presumption completely drops out of the picture. . . .
> The ultimate burden of persuading the trier of fact
> that the defendant intentionally discriminated . . .
> remains at all times with the plaintiff. . . .  Thus,
> once the employer has proffered its nondiscriminatory
> reason, the employer will be entitled to summary
> judgment (or to the overturning of a plaintiff's
> verdict) unless the plaintiff can point to evidence
> that reasonably supports a finding of prohibited
> discrimination.

James v. N. Y. Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000)

(internal quotations marks and citations omitted).

With regard to the Plaintiff's prima facie case, the court

believes that the Plaintiff has satisfied his burden.  The

Plaintiff has asserted that he is a member of a protected class,

and there is no dispute that he was qualified for his position.

Furthermore, a plaintiff sustains an adverse employment action if

he or she endures a "materially adverse change" in the terms and

conditions of employment.  <u>Galabya v. New York City Bd. of Educ.</u>,
202 F.3d 636, 640 (2d Cir. 2000).  "An 'adverse employment
action' is one which is more disruptive than a mere inconvenience
or an alteration of job responsibilities."  <u>Terry v. Ashcroft</u>,
336 F.3d 128, 138 (2d Cir. 2003) (internal quotations marks
omitted).  "Examples of materially adverse changes include
termination of employment, a demotion evidenced by a decrease in
wage or salary, a less distinguished title, a material loss of
benefits, significantly diminished material responsibilities, or
other indices . . . unique to a particular situation."  <u>Id.</u>
(internal quotations marks omitted).  Additionally, the Second
Circuit has held that adverse employment actions may include
"discharge, refusal to hire, refusal to promote, demotion,
reduction in pay and reprimand," <u>Morris v. Lindau</u>, 196 F.3d 102,
110 (2d Cir. 1999) and "are not limited to 'pecuniary
emoluments,'" <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 720 (2d
Cir. 2002).  <u>See</u> <u>Phillips v. Bowen</u>, 278 F.3d 103, 109 (2nd Cir.
2002).

The Plaintiff's termination obviously qualifies as an
adverse employment action.  In addition, although negative
performance evaluations, without any accompanying adverse
consequences, are not adverse employment actions, <u>see</u> <u>Valenti v.</u>
<u>Massapequa Union Free Sch. Dist.</u>, Nos. 03-CV-1193 (JFB)(MLO),

04-CV-5271 (JFB)(MLO), 2006 WL 2570871, at *9 (E.D.N.Y. Sept. 05, 2006) (collecting cases), a negative performance evaluation with adverse consequences may qualify as an adverse employment action. Here, the April 11, 2003 performance review described the Plaintiff as insubordinate, stated that his job performance was poor, and recommended that the Plaintiff be terminated from his position.  The Plaintiff's termination occurred soon thereafter. As the burden in establishing a prima facie Title VII discrimination case is minimal, see James, 233 F.3d at 153-54; Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004), the court finds that the Plaintiff has established his burden with regard to "adverse employment actions," and has met his prima facie case.

Next, the Defendant must articulate a non-discriminatory reason for its actions.  "This burden is one of production, not persuasion; it can involve no credibility assessment."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (internal quotation marks omitted).  The Defendant has provided non-discriminatory reasons for its actions, i.e., that the Plaintiff failed to improve his job performance despite repeated counseling and written warnings.

Because the Defendant has articulated non-discriminatory reasons for its conduct, "the McDonnell Douglas framework--with

its presumptions and burdens--disappear[s], . . . and the sole remaining issue [is] discrimination vel non . . . ." Id. at 142-43 (internal citations and quotation marks omitted). That is, the Plaintiff now must point to evidence that reasonably supports a finding of prohibited discrimination, i.e., that the Defendant's proffered non-discriminatory reasons are merely pretext for wrongful discrimination. The court does not believe that the Plaintiff has met his burden here.

The Plaintiff has not presented the court with evidence demonstrating that the his negative performance review and termination were the result of national origin discrimination. There is no evidence that the April 11, 2003 performance review and the Plaintiff's April 15, 2003 termination were motivated by wrongful discrimination. Even considering the time-barred conduct, which may be offered as evidence of discriminatory intent to support the Plaintiff's timely claims, there is no indication that the Plaintiff's national origin played a part in the Defendant's conduct. The Plaintiff was an employee of the Defendant. After working for the Defendant for approximately four years, his position changed from "Cash Applicator" to "Sales Analyst"; approximately three years after that, his position changed to "Sales Specialist." In November 2001, the Plaintiff's department was reorganized, his title was eliminated, and he was

given a new position with a new title ("Account Coordinator"),
and placed under the supervision of Sachse.  Although the
Plaintiff asserts that this new position, was a "demotion," he
has testified that the new position was not given in an effort to
discriminate against him.  The Plaintiff's first performance
review in his new position was mostly positive, but had a
notation that the Plaintiff needed to improve his timeliness.
Around the time of that first performance review, the Plaintiff
received a raise.  Then, in August 2002, Sachse verbally warned
the Plaintiff about a wrongly formatted, late report that
contained incorrect information, and informed the Plaintiff that
his performance would be monitored.  According to the Defendant,
the Plaintiff's "performance problems" continued, resulting in,
among other things, the March 13, 2003 "Final Written Warning,"
and the April 2, 2003 negative annual performance evaluation.
There is no indication that the above-mentioned actions were
based upon the Plaintiff's national origin, and thus they do not
offer evidence of discriminatory intent that would support the
Plaintiff's timely claims.

Additionally, even assuming Sachse said that she would give
the Plaintiff so much work, he would become frustrated and quit,
there is no reference to Plaintiff's national origin in that
comment.  Furthermore, even if Sachse and Sestito would not greet

the Plaintiff in the morning, and if the Plaintiff had a fax machine and paper shredder in his cubicle, these facts do not indicate a discriminatory animus based on the Plaintiff's national origin.  Consequently, with regard to the Plaintiff's Title VII national origin discrimination claim, the Defendant's motion for summary judgment **(dkt. # 36)** is **GRANTED.**

### D. TITLE VII RETALIATION CLAIM

Title VII prohibits retaliation against employees who exercise rights protected by the statute.  <u>See</u> 42 U.S.C. § 2000e-3(a).  Like substantive Title VII discrimination claims, retaliation claims brought pursuant to Title VII are reviewed under the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u> <u>Terry</u>, 336 F.3d at 141 ("The <u>McDonnell Douglas</u> burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII.")  First, "[t]he complainant in a Title VII [case] must carry the initial burden under the statute of establishing a <u>prima facie</u> case . . . ."  <u>McDonnell Douglas</u>, 411 U.S. at 802.  "In order to establish a <u>prima facie</u> case of retaliation, [a plaintiff] must show that: (1) []he engaged in a protected activity; (2) h[is] employer was aware of this activity; (3) the employer took adverse employment action against h[im]; and (4) a causal connection exists between the alleged adverse action and

-29-

the protected activity." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 608 (2d Cir. 2006).

Next, if a plaintiff establishes a prima facie case, "[t]he burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." McDonnell Douglas, 411 U.S. at 802. Finally, if the defendant does articulate a legitimate, nondiscriminatory reason for the adverse employment action, "[t]he plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext . . . .'" Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 123 (2d Cir. 2004) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)); see McDonnell Douglas, 411 U.S. at 804.

The court finds that the Plaintiff has satisfied the first three elements of the prima facie case. The Plaintiff engaged in protected activity by filing a CHRO complaint against the Defendant and by complaining to HR, the Defendant knew about these activities, and, as discussed above, see supra Part III.C, the Plaintiff suffered adverse employment actions.

The final prima facie element for a Title VII retaliation claim is the "causal connection" element. Of course, the causal connection between a protected activity and an adverse employment

action may be established by direct evidence.  The Plaintiff has provided no such direct evidence.  In addition, however, "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (internal quotation marks omitted).  The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (collecting cases).

In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship.  See Deravin v. Kerik, No. 00 CV 7487(KMW)(KNF), 2007 WL 1029895, at *11 (S.D.N.Y. Apr 02, 2007) (collecting cases).  Within the time period of one year, there is no firm rule.  In some cases, time periods ranging from twelve days to eight months have been found to show the necessary temporal proximity.  See id. n.21 (collecting cases).  In other cases, time periods ranging from two-and-a-half months to eight months

have been deemed insufficient to show the necessary temporal proximity. See id. n.22 (collecting cases).

For the purposes of this motion, the court shall assume that the necessary temporal proximity has been shown between the Plaintiff's CHRO complaint and the adverse employment actions. Here, the Plaintiff engaged in the protected activity (i.e., the filing of his CHRO complaint) on October 7, 2002. The adverse employment actions the court may consider (i.e., the Plaintiff's April 11, 2003 performance review and the Plaintiff's April 15, 2003 termination) occurred approximately six months after the protected activity. For the purpose of establishing the "causal connection" element, the Second Circuit and district courts within the Second Circuit have deemed such time periods sufficient. See id. n.21. Therefore, the court finds that the Plaintiff has established a prima facie Title VII retaliation case.[9]

Next, the Defendants must articulate some legitimate, nondiscriminatory reason for the adverse employment actions taken against Douglas. As explained above, see supra Part III.C, the Defendants have done so. The Plaintiff, then, must "point to

---

[9]Because the record is not clear as to when the Plaintiff made his complaint to HR, the court cannot determine whether the necessary temporal proximity has been shown with regard to that complaint. Such a determination does not affect the court's decision here, however, as the court has found the necessary temporal proximity with regard to the Plaintiff's CHRO complaint has been shown.

evidence that would be sufficient to permit a rational factfinder to conclude that [his] employer's explanation is merely a pretext for impermissible retaliation." <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 721 (2d Cir. 2002). The "causal connection" argument is insufficient, by itself, to demonstrate pretext here. <u>See</u> <u>Diggs v. Town of Manchester</u>, 303 F. Supp. 2d 163, 179 (D. Conn. 2004) ("The mere temporal proximity of [the adverse employment actions] to [the protected activities] i[s] not enough, in and of itself and under the circumstances, to support a finding of pretext [for impermissible retaliation].") (citing <u>Holtz v. Rockefeller & Co.</u>, 258 F.3d 62, 81 (2d Cir. 2001)).

The Plaintiff has failed to present evidence showing that the Defendant's proffered reasons for the adverse actions taken against the Plaintiff were pretext for wrongful retaliation. As explained above, <u>see</u> <u>supra</u> Part III.C, even considering the time-barred conduct, which may be offered as evidence of discriminatory intent to support the Plaintiff's timely claims, there is no indication that the Plaintiff's national origin played a part in the Defendant's conduct. Consequently, with

regard to the Plaintiff's Title VII retaliation claim, the
Defendant's motion for summary judgment **(dkt. # 36)** is **GRANTED**.[10]

### E. TITLE VII HOSTILE WORK ENVIRONMENT

Title VII has been interpreted to prohibit conduct
"requiring people to work in a discriminatorily hostile or
abusive environment." Harris v. Forklift Sys., Inc. 510 U.S. 17,
21 (1993). "A hostile work environment claim requires a showing
[1] that the harassment was sufficiently severe or pervasive to
alter the conditions of the victim's employment and create an
abusive working environment, and [2] that a specific basis exists
for imputing the objectionable conduct to the employer." Alfano
v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation
marks omitted); see Harris, 510 U.S. at 21.

"The plaintiff must show that the workplace was so severely
permeated with discriminatory intimidation, ridicule, and insult
that the terms and conditions of her employment were thereby
altered," Alfano, 294 F.3d at 373, and that such harassment
occurred because of his national origin, see Oncale v. Sundowner
Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (holding that Title
VII is directed only at discrimination based upon the categories
protected by Title VII). "This test has objective and subjective

----

[10]As the court has found that the Plaintiff's Title VII retaliation
claim fails on the merits, the court shall not address the Defendant's
argument that this claim is time-barred under Mohasco Corp. v. Silver,
447 U.S. 807 (1980).

elements: the misconduct shown must be severe or pervasive enough
to create an objectively hostile or abusive work environment, and
the victim must also subjectively perceive that environment to be
abusive." Alfano, 294 F.3d at 374 (internal quotation marks
omitted). "As a general rule, incidents must be more than
episodic; they must be sufficiently continuous and concerted in
order to be deemed pervasive. . . . Isolated acts, unless very
serious, do not meet the threshold of severity or pervasiveness."
Id. (internal quotation marks and citations omitted).
Nevertheless, "it is well settled in this Circuit that even a
single act can meet the threshold if, by itself, it can and does
work a transformation of the plaintiff's workplace." Id. "In
short, a plaintiff alleging a hostile work environment must
demonstrate either that a single incident was extraordinarily
severe, or that a series of incidents were sufficiently
continuous and concerted to have altered the conditions of her
working environment." Id. (internal quotation marks omitted).

    In the court's view, the Plaintiff has not satisfied his
burden in establishing a hostile work environment claim. First,
the Plaintiff has not demonstrated that his workplace was
severely permeated with discriminatory intimidation, ridicule,
and insult. Throughout his employment with the Defendant, the
Plaintiff had his title changed, received some negative

evaluations, was placed in a cubicle with a fax machine and paper shredder, was denied request for a laptop computer, and, apparently, was not on the friendliest terms with Sachse and Sestito. These circumstances are not sufficient to support a hostile work environment claim. Second, even if these circumstances constituted a workplace "severely permeated" with "intimidation, ridicule, and insult," there is no indication that they resulted from discriminatory intent. That is, the Plaintiff has not demonstrated that this alleged harassment occurred because of his Jamaican background. Consequently, with regard to the Plaintiff's Title VII hostile work environment claim, the Defendant's motion for summary judgment **(dkt. # 36)** is **GRANTED.**

## F. VACATION PAY CLAIM

In his complaint, the Plaintiff has alleged that the Defendant failed to pay him for vacation time owed to him. The Defendant has treated this allegation as a claim separate from the Plaintiff's Title VII claims. The court is unsure of the legal theory under which the Plaintiff believes he is entitled to vacation pay. As the Defendant points out, under Connecticut law, "[i]f an employer policy or collective bargaining agreement provides for the payment of accrued fringe benefits upon termination, including but not limited to paid vacations, holidays, sick days and earned leave, and an employee is

terminated without having received such accrued fringe benefits,
such employee shall be compensated for such accrued fringe
benefits . . . ." Conn. Gen. Stat. § 31-76k. It would seem that
the Plaintiff's claim here must be premised on an "employer
policy or collective bargaining agreement" whereby he is entitled
to vacation pay after his termination. Therefore, the court
shall construe this claim as a breach of contract claim under
Connecticut law.

As the Plaintiff's federal claims have been disposed of in
summary judgment, his only remaining claim is the breach of
contract claim under Connecticut law. "Certainly, if the federal
claims are dismissed before trial, even though not insubstantial
in a jurisdictional sense, the state claims should be dismissed
as well." Castellano v. Bd. of Trs. of the Police Officers'
Variable Supplements Fund, 937 F.2d 752, 758 (2d Cir. 1991)
(quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).
"If it appears that the federal claims . . . could be disposed of
on a motion for summary judgment under F.R.Civ.P. 56, the court
should refrain from exercising pendent jurisdiction absent
exceptional circumstances." Kavit v. A.L. Stamm & Co., 491 F.2d
1176, 1180 (2d Cir. 1974). Because the Plaintiff's federal
claims have been disposed of on a motion for summary judgment,
his vacation pay claim, which is based on state law, is hereby

**DISMISSED without prejudice to the Plaintiff bringing that claim in state court**.

### IV. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment **(dkt. # 36)** is **GRANTED** with respect to the Plaintiff's federal claims.  Judgment in favor of the Defendant shall enter with regard to the Plaintiff's Title VII claims.  The Plaintiff's vacation pay claim is **DISMISSED without prejudice to the Plaintiff bringing that claim in state court**.  The Clerk of the Court shall close this file.

**SO ORDERED** this <u>28th</u> day of August, 2007.

<u>        **/s/DJS**        </u>

**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**